Good morning, ladies and gentlemen. This is Judge Scudder from the courtroom in Chicago. We have Judge Rovner and Judge Hamilton connected remotely, as we do the lawyers. This has worked out pretty well for our court. I'll be patient with timekeeping. Occasionally, we'll run across a little connection glitch. No one should worry. We'll get through it just fine. We'll begin with our first case of the day, which is Muskegan Hotels v. Hiren Patel and others, No. 20-1475. We'll begin with Mr. Leonard. Good morning. Good morning, Your Honor. May it please the court, Mike Leonard on behalf of the appellants. We seek reversal of the district court's ruling that dismissed the appellant's motion to leave to file a fifth amended complaint. In so finding, Judge Tharp first found correctly that there was a viable fraud scheme that had been pled. In short, the fraud scheme consisted of a bank, which was the enterprise, intentionally procuring inflated appraisals so that it could sell hotels and commercial properties at inflated prices for essentially double their value. And the benefit to them was to not only sell the properties, but to get loans in connection with those sales so that they could receive interest payments. And because of the inflated values and the actual worthlessness of the properties, the bank could then take those properties back after receiving those funds and sell them again. Mr. Leonard, this is Judge Rovner. Good morning. Good morning. Where in your complaint, the fifth amended complaint, do you allege that the firms controlled the NRB or made decisions on its behalf or counseled them how to execute the fraud? Do you have any specific factual allegations that the firms knew that the appraisals had been inflated? Yes, we do, Judge. First of all, as to your first point with regard to operation or management, Judge Tharp did find correctly in his opinion prior to the motion for reconsideration opinion that Woolen and Rosen was one of the entities that conceived of the scheme to defraud. So from its very inception, the judge found that Woolen and Rosen, and I have to separate out when you asked about the firms, that's not Smith-Ominson, but that's Woolen and Rosen, participated at the very beginning at the inception of the fraud. And I think that's important for several reasons because Judge Tharp, like many courts, goes back to Reeves. And Reeves is very different than our case and many other cases involving attorneys because the foundation for Reeves is an accounting relationship, which is fundamentally different than a lawyer-client relationship in that in the accounting relationship, they're not only discouraged from making decisions on behalf of the entity, they're supposed to be objective third parties merely providing advice. But is knowledge enough in any event? I mean, doesn't Amanis say that merely performing services for an enterprise, even with knowledge of the enterprise's illicit nature, does not expose the hired service provider to RICO liability? Yes, and I understand, Your Honor, the distinction that you and some of the cases are trying to draw between what the case law calls mere legal services versus activities that would show more of a level of management and control. And I think the problem with some of the decisions is they simply look at the panoply of activities performed by attorneys and say, those are legal services without making a proper inquiry into whether that really equates with management and control and operational decision-making. And in this case, when Judge Tharp found at its inception that the attorneys initiated, at least in part, the fraud scheme, I think that is enough evidence, record evidence of management or operational control. If I could follow up, Mr. Leonard, the question Judge Rovner asked was not about Judge Tharp's opinions, but about what you allege in the complaint about firms. I understand, Judge. We have alleged that Warren and Rosen knew that the inflated appraisals were, in fact, inflated. And we also allege with specificity that from the inception that they were involved in the decision-making to initiate the fraud scheme. And based upon... What does that mean? Meaning that they helped plan the fraud scheme at the beginning. I mean, I'm going to go back to my question again. Do you have any specific factual allegations that the firms knew that the appraisals had been inflated? We do. We allege with regard to Warren and Rosen that they not only participated in the initial initiation of the scheme, therefore, they knew that they were going to use fraudulent appraisers going forward. But in the ordinary course of carrying out the scheme, that they at all times understood that the appraisals submitted by Dodano were false. With respect to the later firm, which is a Smith Amundsen entity, it's alleged that they knew because in their files they had real legitimate appraisals from Dodano and his entities, as well as false appraisals. So they were on notice that these appraisals that were being used were fabricated. Mr. Leonard, let me ask a stripe of the same question. Where I pause is when you use words like, we allege that Warren and Rosen helped conceive of the fraud scheme, or helped design it, or words to that effect. I have the fifth amended complaint right in front of me. I'm sure you do too. And I'm wondering, do you have in mind the allegations, for example, in paragraphs 14, 15, 16? Or what specific paragraphs contain the allegations to support those statements? Sure. The specific allegations that would go to Warren and Rosen that are in the fifth amended complaint appear at paragraphs 14 to 16, 19, 138, 150, 161 to 162, 165 and 168. Okay. In which of those paragraphs, if you can go back to where you were a minute or so ago on you know, being involved in conceiving of the fraud scheme, I think conceiving is the word that I remember you using. I did. What paragraph supports that argument? I can ask the question a different way as you're looking there. In your blue brief, your opening brief, you contend that Warren and Rosen and the Smith firm were, as you argue, the linchpins. Linchpins is the word you use in carrying out the racketeering activities of the bank. And what I'd like to do is to try to tether that argument to the complaint, to a particular paragraph in the complaint. Sure. I would first of all concede, Judge, that we have not alleged the date or time of the particular meeting in which the fraud scheme was conceived. I agree that that is absent from the complaint. What about the substance of the law firms being involved in the conception of fraud scheme? Well, certainly, I guess paragraph 168 generally references that. 161 generally references that. Is that sufficient under the pleading standard we're operating under though? Well, Judge, I think it is. And I think the district court correctly found that based upon the nature of the allegations as to Warren and Rosen, that we had sufficiently alleged, at least an inference, that they were one of the architects of the scheme. It's very difficult. I'm sorry, Judge. You see, Mr. Leonard, there are a lot of conclusory allegations in your opening briefs. In the reply brief, what you have asserted is that you've preserved all of your arguments. And I'm going to quote, because the opening brief incorporates all arguments made in objections to motions to dismiss and upon rehearing. But my problem is that we have long held that a party cannot preserve arguments on appeal by incorporating by reference arguments made in other documents and pleadings. You know, you didn't raise the RICO 1962A claim, the investment of RICO process in the opening brief. What I was, and I believe the other judges are looking for, are allegations that the firms used racketeering income to operate NRB. They weren't operating NRB at all. You know, so that's the problem we're trying to get to here. Well, I understand, Judge. And I think the problem with some of the case law is the labels of taking the contact and saying it's merely legal services, when in a case like this, if you accept the district court's inference, reasonable inference from the face of our complaint and our allegations, that Wolin and Rosen, as opposed to Smith-Amundsen, was involved in the inception in terms of the design of the scheme, and then carried out all aspects of the scheme. Certainly, I think there's a reasonable inference that that is a level of management and control of the enterprise. I agree that if you just segregate out everything they do and say, gee, that activity is merely legal services, that activity is merely legal services, it's virtually impossible for a law firm to ever be held liable under RICO, which is not what the Reeves court held. And in Reeves, they dealt with a very different type of professional service provider. So I think for those reasons, the Reeves line of cases, the cases that follow Reeves that merely categorize what attorneys do is merely legal services doesn't get to the heart of what Reeves wanted courts to inquire it to. They didn't say in Reeves that professional service providers such as lawyers or law firms can never be liable under RICO. They simply said that you have to come forward at the pleading stage with sufficient information that a reasonable inference is that you participated in the management or operation. And I'd note that in Reeves, that that case was decided at summary judgment after discovery. So we had made a sufficient showing that Warren and Rosen helped participate in designing the scheme that should certainly open the door for discovery and allow us to get detailed information on what their actual role was. What persuasive power did they use? Did the company simply rubber stamp Warren and Rosen's concept of using the inflated appraisal scheme? Those would always all be directly relevant to the factual question of whether Warren and Rosen exercised to reach the conclusion of whether Warren and Rosen exercised management or operational control of NRB with respect to the scheme. Mr. Leonard, could I ask you about the underlying scheme itself? As I understand it, the core of the case is that the seller lenders in these commercial transactions defrauded the buyers and borrowers who relied only on what the sellers were telling them about the value of the property. Is that right? I wouldn't say they relied only upon it. I'm not discounting the fact that they could do due diligence, but certainly, Judge, yes, the core of our allegation is that they were presented with fraudulent appraisals, which put the value of the properties at two times the real value, which they, in fact... In what circumstances in a commercial transaction like this may the buyer reasonably rely on the seller's assertion of value? Well, Judge, it goes far beyond that because in this case, the allegation as pled is not simply that NRB came up with the appraisals. As part of the scheme, one of the other significant participants was a different individual who controlled appraisal entities, so the Dodano individual was... No, no, no, no, no. I'm trying to think... In this transaction, there are people on one side of the table who were selling and lending, people on the other side of the transaction who were buying and borrowing, and you're telling me that commercial investors took at face value appraisals that were provided by the sellers and said, yeah, good enough for us. We'll write the checks. Well, that's not quite accurate, Judge. The appraisals were provided by what appeared to be and what was represented as an independent third party, the Dodano... Of course they were. And that's enough? It's enough certainly to induce reliance, Judge. When the appraiser holds himself out as to be someone sophisticated in hotels and the appraisal for hotels and hotel transaction, yes, I think that would be certainly... That reliance question would certainly be a question of fact for the jury as to whether it was reasonable based upon the different levels of sophistication and experience for the lender to rely upon a third party that's fraudulent being represented to them as independent of the bank. So NRB is holding them out as someone who is apart from them at arm's length, and they're not. So clearly that would be a question of fact not to be resolved at the pleading stage. I see that I have three minutes left. I'd like to reserve those three minutes. Yeah, that would be fine, Mr. Leonard. Thank you. Thank you. Mr. Grand, we'll go to you on behalf of Wolin and Rosen. Thank you, Your Honor. Good morning. And may it please the court on behalf of the co-defendant appellee, Wolin and Rosen. I have to first go to the last question that Judge Hamilton raised there in counsel's answer. I don't know of any allegation. I don't believe there's any allegation in the Fifth Amendment complaint about holding out as counsel just described. So I don't believe that's in the complaint. But what I find most concerning and frankly more inaccurate is the premise of counsel's argument today that the district court, of course, this is de novo review. So even if the district court reached an erroneous decision, but the I mean, what appears to be the premise that the cross plaintiffs are relying on is paragraph 165, which contains the language that Mr. Patel conceived of the scheme with Mr. Wolin, Mr. Fitzgerald and Mr. Dodano. And that's it, conceived of. I don't know what conceived of is, but that is a allegation that I don't think is frankly relevant at all. And the other specific paragraphs, I tried to write them all down when counsel was speaking to flip through the Fifth Amendment complaint pertained to Wolin and Rosen's work preparing possibly some loan modifications, being the closing attorney. This is legal work. And, you know, let's just take a step back. And I think that the fear and the only inference from the Fifth Amendment complaint inferences are that Wolin and Rosen did not run the bank, did not negotiate the real estate transactions. Wolin and Rosen is not an appraiser, was not the closing agent for the transactions. Again and again in the Fifth Amendment complaint, the cross plaintiffs alleged that Mr. Fitzgerald was a as Judge Hamilton pointed out, on the opposite side of the real estate transactions and he had no fiduciary relationship or obligation. So, you know, with respect to the RICO accounts, which are the only accounts that initially were addressed, you know, a close search for allegations supporting the conclusion that the law firms were participants and not mere hirelings simply does not reveal anything that supports the cross plaintiffs position. And, you know, I have to point out that there is nothing in this record that indicates that Mr. Wolin was an architect or actually was involved. Our position is not that attorneys can never have any RICO liability. We've never argued that. The case law doesn't support. But the decisions of this court makes clear that a lawyer does not and that's true under this circuit's case law, even if the client allegedly is engaged in unlawful activity. Forgive me, Mr. Crand, suppose Wolin and Rosen were aware at the time of the closing that the appraisals were fraudulently high but carried on with its role without doing or saying anything about that. Would that be a sufficient hook for a RICO claim? I'm sorry, Your Honor. No, no, go ahead. I don't believe so. But in any event, that's not alleged here. Is it? You know, the only the routine participation of Ms. Kaminsky in these closings is what is alleged for a fee of, I think it was repeatedly set forth in paragraph 141 in the table that accompanies that paragraph, possibly 142 as well, that the fee was $2,000. There's nothing in this record to suggest that there was nothing other than conclusions to suggest that was knowledge. But it goes beyond knowledge and what would be required is for lawyers to be meaningfully facilitating the client's commission of the type of repeat criminal behavior that's required for RICO liability. You know, there is, I'm sorry, were you speaking, Judge? No. So, you know, all that cross plainness alleged that Wolin and Rosen did here beyond the very broad allegations was to perform closings for transactions they did not help structure with borrowers and buyers they did not seek out, terms that they did not negotiate, prices that they did not set, appraisals they did not help create or procure. And as Judge Hamilton noted, appraisals that cross plainness as sophisticated commercial real estate investors evidently are suggesting that they accepted at face value without any further investigation. Mr. Grand, if you look at, in fairness to Mr. Leonard's position, yes, if you look at paragraphs 161, for example, and 16, okay, there is an allegation that Wolin and Rosen knew of the inflated appraisals. Okay, that does appear there. Yeah, the conclusion appears there, your honor. Right. Is it, is your point that stating or just asserting that level of knowledge doesn't satisfy the pleading standard that they're under in a case like this, point number one, and point number two, that it doesn't satisfy the Reeves standard? It does not, your honor. And first of all, you know, from the standpoint of the pleading that's required, there has to be something more than a general allegation of knowledge. There has to be some sort of subsidiary facts alleged that would support that conclusion. And there's, there's, you know, there, there, I didn't say that the given, given rule nine's provision for alleging states of mind generally. I, I'm sorry, your honor. Why do you say that an allegation of knowledge is conclusory given that rule nine tells us that states of mind, for example, in fraud allegations may be alleged generally? Your honor, the case law refers to the requirement that there be subsidiary facts that, that exceed the general pleading standard for allegations of knowledge. And how do you reconcile that with rule nine? I believe it's a, it's a, it's a lower, it's a lower standard than the particularity standard, but, but I, but it's, that's how the court has, has interpreted rule nine. In any event, what is clear from the facts that are alleged is that we're talking about the conduct of Woolin and Rosen as the attorney who was involved in the closings and, and truly, truly nothing more. The, the, the district court also in addition to I think accurately coming to the conclusion that the attorneys were alleged to be nothing more than mere hirelings, which I think is consistent with this court's analysis and the Dumanis case is that the allegations don't show a pattern of racketeering activity. And which is required to be pleaded with particularity under rule nine. And I think that's a correct conclusion based on the allegations here, which are given that only the cross plaintiffs were involved in the allegations that were pleaded with particularity, the timeframe and the nature of the acts that simply do not meet that threshold. I can, I can also, if I haven't run out of time, it looks like I am running out of time and we'll stand on our brief as to the statute of repose dispensing with all of the claims against Woolin and Rosen on the state law accounts. And if, if the court has any questions that will allow me to answer on that point before I sit down, I'd be happy to do it. Okay. Hearing none. Thank you, Mr. Thank you very much. Mr. Dunn, we'll turn to you now. Good morning. Good morning, your honors. Fitz Dunn on behalf of Smith Amundson. May it please the court. I want to be brief here and I want to discuss what Smith Amundson has alleged to have done in this action. These transactions occurred 2007. Smith Amundson has alleged the complaint was hired in 2012. What did Smith Amundson do? It defended NRB in this action until the FDIC took over NRB and replaced them with substitute counsel. Two months later, cross players, Sue and Smith Amundson. That is what is alleged. There is no specificity with respect to anything that Smith Amundson knew should have known or not. The temporal relationship to the purported scheme is way too far. And their liability for defending NRB in this action has nothing to do with the alleged scheme. There's no knowledge. There's nothing. As you pointed out, there's one paragraph in the complaint that said something about knowledge, which is paragraph 24. And it essentially is a conclusion that says because Smith Amundson started representing NRB after 2012, it may have known or had appraisals by Dodano that were right and some were wrong. That's not sufficient to state a claim against Smith Amundson. There's nothing in this complaint that says a cause of action against Smith Amundson for either RICO state law claims or anything. The district court was correct and we respectfully ask that you affirm dismissal. If you have any questions, I'd be happy to take them. What do you think we have jurisdiction over? We have jurisdiction over Smith Amundson, Mullen Rosen, Chankrat Patel, I think that's how he says his first name, and the state bank in Texas. So any issues that would on their liability are up for us because they were all. However, with respect to state bank and Mr. Patel, we have waived arguments with regard to that. With respect to Mr. Herron Patel, he was not named in the judgment, and so he should not be a party to this appeal. Okay, and nothing with respect to Mr. Merchant or his estate? I don't believe he's got standing because he hasn't been injured. He was either investor in the LLC that's suing, so he does not have standing. Oh, hold on. Separate and apart from the merits of the standing question, Mr. Dunn, is it your impression that Michael Merchant or his father's estate were part of the Rule 54B judgment? Your Honor, I don't know. I have to look at the judgment again. I wasn't really focused on this. I don't mean to put that to you as a quiz question. It's not your client either. My understanding is, please tell me if I'm wrong. I didn't understand the argument. It wasn't raised until the motion for reconsideration, so it's been waived. Isn't that not so? Your Honor, which argument? Well, you know, the whole bankruptcy business. That was raised in response to the motion to reconsider in support of, I think, plaintiff's contention that the statute of repose was pulled, or are you speaking with respect to Mr. Fitzgerald's bankruptcy? You know, as I say, I did not understand the argument. And it seemed to me that Merchant's bankruptcy would be irrelevant to the statute of repose here. I mean, the automatic stay under bankruptcy law for judicial proceedings against a debtor doesn't apply to suits brought by the debtor, so. Your Honor, I understand that, but that's more of a Mr. Grand question. Yeah, you're right. And I'll cede my time to her to the extent that you question me. Except she was gone, so I'll take any, you know. I'm not with the one I love, I love the one I'm with. Mr. Dunn, that's a fair response and a suggestion. Mr. Grand, if you have anything to offer on the couple of questions that we've been asking here of Mr. Dunn, you're welcome to weigh in. Moot. Okay, thank you, Judge. And thank you for allowing me to address the court again, and that's exactly right, Your Honor. The rule 362 stay would have nothing to do with any action that Mr. Merchant would have wanted to bring. So that, in addition to having been waived by it's being raised, I believe for the first time on reconsideration, it wouldn't help anyway, because it didn't stop the bankruptcy trustee from asserting any claims. So I don't believe that has any relevance on the stand to repose issue. Thank you. And Mr. Grand, while we have the benefit of you here, what's your view on our questions about the scope of this appeal? To what does our appellate jurisdiction extend? I agree with everything that Mr. Dunn said, but frankly, I'd have to cheat and look at the district court's order, which is on my table here, to see if the standing issue was raised as part of that finding. And my recollection is, and of course, the moving parties, or rather the law firms and the cross plaintiffs all agreed that they wanted 54B certification, but I have to look back at the order to see if it encompassed the standing issue. That's okay. I'm sorry. Go ahead, Judge Hamilton. I was going to say, at least my understanding is we're not talking about a 1292B certification of issues. Rather, we've got a judgment. Correct. We've got a judgment as to these four defendants. So I would think, in essence, any ground for reversing or affirming that judgment would be available on appeal as long as it was properly raised or is jurisdictional. But that's my working hypothesis. Let me put it that way. And I agree with that hypothesis, and I'm just looking at the order now. I think that makes perfect sense, Your Honor. Okay. Thank you. Thank you very much. Okay. Very good. Mr. Leonard, we'll return to you. You've got a little over three minutes. You're on, yeah, unmute. I'm sorry. That's okay. I would like to start with the point that Mr. Grant made about Judge Starp's order and ruling in his March 25th decision on the motion to dismiss. And I did say earlier that the district court properly found that Wong and Rosen had conceived of the scheme along with two of the other defendants. And I still stand by that. I then went on to use the word architect interchangeably with Judge Starp's March 25, 2019 decision, where he says that first and most directly, the complaint alleges that in 2003, Irene Patel and Fitzgerald conceived of the scheme along with Philip S. Wollin of cross-defendant Wong and Rosen. So I think that he did correctly make the finding that based upon the allegations as a whole, that Wong and Rosen was one of the conceivers or architects of the scheme, which is quite different than merely providing legal services. It's the initiation, it's the management of a fraud scheme, which are not merely legal services. And certainly those allegations should, like in Reeves, be subject to discovery. And I know I only have about two minutes, but didn't you get a chance to address the judge's decision dismissing all of the common law claims against Wong and Rosen? And as Mr. Grand just mentioned in reference very briefly, that was based upon a statute of repose finding by the district court. Essentially, he correctly found that the statute of repose would have extended the time for these cross plaintiffs to file their common law claims against Wong and Rosen until 2013. He then next considered the question of whether those claims would be, should be extended by another five years. And that was based upon the Illinois doctrine and statute relating to fraudulent concealment. The district court's sole basis for finding that fraudulent concealment cannot apply was its citation to the Brunswick case. That was the sole authority for the court's finding. Brunswick is extraordinarily different than the situation faced here. Brunswick is an Illinois appellate court decision in which a party, one party who is a party to a lawsuit that settled during the trial, it was much publicized, alleged that the Brunswick lawyer should have communicated his client's acceptance of a settlement agreement during jury deliberations. All that the Brunswick case stands for is that there's not an independent cause of action against a company for that type of failure to speak. Brunswick does not address at all the fraudulent concealment arguments we've made in our brief and which are applicable. If this court properly applies the concept of fraudulent concealment,  we're properly brought within the appropriate statute of limitations. And I thank you for your time. Mr. Leonard, thanks to you and all counsel. The case will be taken under advisement.